UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DELPHI AUTOMOTIVE PLC,

Plaintiff,

v.

JOHN P. ABSMEIER,

Defendant.

_____/

Case No. 15-cv-13966

UNITED STATES DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

UNITED STATES MAGISTRATE JUDGE
DAVID R. GRAND

**OPINION AND ORDER GRANTING PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION [18]**

## I. INTRODUCTION

Delphi Automotive PLC ("Plaintiff") commenced the instant action against its former employee, John Absmeier ("Defendant") on November 11, 2015. Dkt. No. 1. In its Amended Complaint, Plaintiff alleged that Defendant breached his contractual obligations, misappropriated trade secrets, and breached his fiduciary duties by terminating his employment with Plaintiff and accepting employment at Samsung. Dkt. No. 16, pp. 22–26 (Pg. ID No. 154–58).

Presently before the Court is Plaintiff's Motion for Preliminary Injunction, in which it seeks to enforce a restrictive covenant against Defendant, enjoin Defendant from disclosing any of Plaintiff's confidential or proprietary information, and order Defendant to return all of Plaintiff's property. Dkt. No. 18.

-1-

The Court held a hearing on this Motion on February 23, 2016. After considering the briefs and oral argument of the parties, the Court will **GRANT** Plaintiff's Motion for Preliminary Injunction [18]. The Court's reasoning is set forth in detail below.

## II. BACKGROUND

Defendant began his full-time employment with Plaintiff in 1999, working in engineering positions at Plaintiff's Kokomo, Indiana office. Dkt. No. 18, p. 14 (Pg. ID No. 261). From 2001 to 2004, Defendant worked in Plaintiff's Rochester, New York office as a systems engineer. *Id*. Next, Defendant moved to Plaintiff's San Jose, California office to work as a project manager from 2004 to 2006. *Id*. In 2006, Defendant relocated to Shanghai, China, to work for Plaintiff as Business Director of Electronic Controls Asia-Pacific. *Id*. Six years later, in 2012, Defendant returned to work in the United States to work in Plaintiff's facility in Mountain View, California, titled "Delphi Labs @ Silicon Valley." *Id*.

Defendant's work at Delphi Labs @ Silicon Valley involved managing approximately 23 engineers and programmers on work related to advanced vehicular technology and autonomous driving. *Id*. at 14–15. Plaintiff promoted Defendant to the position of Director of Delphi Labs @ Silicon Valley on June 1, 2014. *Id*. at 15.

-2-

On June 27, 2014, Plaintiff had Defendant sign a Confidentiality and Noninterference Agreement as a condition to receive an Executive Restricted Stock Award. *Id.* The parties signed another two, substantively identical, agreements (collectively, "Agreements") on March 5, 2015. *Id.* at 18. In these Agreements, Plaintiff restricted Defendant's ability to seek "directly or indirectly" related employment and prohibit Defendant from sharing any "Confidential Information." *Id.* at 16–17. The non-compete provisions forbid Defendant from "directly or indirectly engag[ing] in Competition" for one year; bans Defendant from engaging in solicitation of similar businesses, Plaintiff's customers, and Plaintiff's employee's for two years; and prohibits Defendant from "otherwise interfer[ing] with the Business of Delphi" for two years. *Id.* at 17.

"Competition" is defined as "any other business or organization anywhere in the world that competes, directly or indirectly, with Delphi in the Business." *Id.* at 18. "Business" is defined as "creation, development, manufacture, sale, promotion, and distribution of vehicle electronics, transportation components, integrated systems and modules, electronic technology and other products and services which Delphi engages in, or is preparing to become engaged in, at the time of [Defendant's] termination." *Id.* Finally, the Agreements stipulate that they are governed by the laws of the State of New York, and that Michigan courts, either

state or federal, will have jurisdiction over any matters arising out of the Agreements. Dkt. No. 18-2, p. 17 (Pg. ID No. 366).

Samsung began to express interest in Plaintiff's vehicle technology in May 2015, allegedly stating that it was "looking for partners to collaborate with in automotive." Dkt. No. 18, p. 20 (Pg. ID No. 267). Samsung offered Defendant a position on October 30, 2015. *Id*. at 21. On November 10, 2015, Defendant gave official notice to Plaintiff of his intent to terminate his employment on November 24, 2015. Dkt. No. 31, p. 15 (Pg. ID No. 535). Plaintiff chose to end Defendant's employment the day after he gave notice, on November 11, 2015. *Id*. The following day, November 12, 2015, Plaintiff served Defendant with this lawsuit. *Id*. Defendant started his employment with Samsung on November 30, 2015. *Id*. Defendant's position with Samsung was titled, "Vice President, Smart Machines Initiative, Samsung Strategy and Innovation Center." Dkt. No. 31-2, p. 15 (Pg. ID No. 571).

Additionally, Plaintiff claims that Defendant downloaded documents and files from his work computer onto external hard drives on May 14, October 15, October 28, and November 3, 2015. Dkt. No. 18, p. 22 (Pg. ID No. 269). Plaintiff argues that these files contained Delphi's proprietary information, *id.*, while Defendant contends that the downloads and deletions were harmless. Dkt. No. 31, p. 16 (Pg. ID No. 536).

Defendant states that the download activities on May 14th and October 15th reflected regular file back-up activities for his work computer. Dkt. No. 31-2, p. 9 (Pg. ID No. 565). Additionally, Defendant maintains that he was transferring personal photos and private files to an external hard drive on October 28th, with the belief that he could transmit work files back to Delphi during the exit process, should he decide to leave. *Id*. at 11. Defendant alleges that the November 3rd download was done for the purpose of ensuring that Delphi had a copy of work-related files to provide to the person who would assume his job duties after he left. *Id*. On November 11, 2015, when Plaintiff informed Defendant that his exit and transition process would take place remotely, Defendant asserts that Plaintiff's employees gave permission for him to delete personal files from his work computer and external hard drive, and observed him as he deleted files. *Id*. at 16.

Furthermore, Defendant states that he left his work computer and two external drives with Plaintiff as of November 11, 2015. *Id*. at 17. Defendant states that he returned other work items to Delphi as of November 17, 2015, including ten external thumb drives, a legal pad, and eleven notebooks. *Id*. at 18. The external hard drives that Defendant kept, containing a mix of Defendant's personal files and Plaintiff's files, have been sequestered with a third-party forensic firm and Defendant has not accessed the drive since sending the drives to the firm. *Id*. at 18–19. Defendant's counsel also directed the forensic firm to quarantine his

Dropbox Account, which contained a mixture of personal files and Delphi files. Dkt. No. 31-3, p. 3 (Pg. ID No. 608). Finally, the forensic firm preserved all of Defendant's emails in his personal Gmail account, and then deleted emails that were in a "Delphi" folder so that Defendant could no longer access them. *Id*. at 4.

## III. DISCUSSION

### A. Contractual Choice of Law Provision

The parties dispute whether the instant action is governed by New York or California law. To resolve this dispute, a federal court whose jurisdiction is based on diversity of citizenship applies the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). In this case, the forum state is Michigan, whose courts follow §§ 187 and 188 of the Second Restatement of Conflict of Laws. *Kipin Indus., Inc. v. Van Deilen Int'l, Inc.*, 182 F.3d 490, 493 (6th Cir. 1999).

The "[p]rime objectives of contract law are to protect the justified expectations of the parties and to make it possible for them to foretell with accuracy what will be their rights and liabilities under the contract." *Chrysler Corp. v. Skyline Indus. Servs., Inc.*, 448 Mich. 113, 125 (1995) (quoting Rest.2d Conflict of Laws § 187 comment e (1971)). Nevertheless, "fulfillment of the parties' expectations is not the only value in contract law; regard must also be had

for state interests and for state regulation." *Id.* (quoting Rest.2d Conflict of Laws § 187 comment g (1971)).

> Section 187 of the Second Restatement of Conflict of Laws provides:
>
> (1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.
>
> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>
>> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>>
>> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.
>
> (3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.

Rest.2d Conflict of Laws § 187 (1971). This means that the enforceability of the non-compete provision in the present case is governed by New York law, unless: (1) New York has no substantial relationship to the parties and there is no other reasonable basis to apply New York law; or (2) New York law is contrary to a

fundamental California policy and California has a materially greater interest in the issue.

Where there has not been an effective choice of law, Michigan's choice of law rules "require a court to balance the expectations of the parties to a contract with the interests of the states involved to determine which state's law to apply." *Mill's Pride, Inc. v. Cont'l Ins. Co.*, 300 F.3d 701, 705 (6th Cir. 2002).

### 1. Substantial Relationship and Reasonable Basis

All of the Plaintiff's stock agreements utilize New York law because Plaintiff wanted a uniform choice of law to govern executives from multiple jurisdictions. Dkt. No 42, p. 7 (Pg. ID No. 766). Plaintiff argues that the choice of New York law should stand because the company has a "significant" presence in New York and trades its stock on the New York Stock exchange. *Id.* (citing *Int'l Bus. Machines Corp. v. Bajorek*, 191 F.3d 1033, 1038 (9th Cir. 1999) (finding that New York law applied where the substantive lawsuit was originally filed in New York, the corporation was headquartered and nationally traded in New York, and the corporation "ha[d] an interest in having all its stock option agreements with employees in different places construed according to the same law.")).

Meanwhile, Defendant asserts that "New York has nothing to do with this dispute," therefore, the choice of law provision should not be given effect. Dkt. No. 31, p. 19 (Pg. ID 539). Defendant notes that Plaintiff's headquarters are

-8-

located in the United Kingdom and maintains a principal place of business in Michigan. *Id.* at 13, 19. Defendant himself has lived and worked in California at all times since signing the Agreements. *Id.* at 13. The Agreements were sent electronically to Defendant, who signed them—without negotiation[1]—in California. *Id.* at 14.

The Court finds that New York's relationship to the parties falls short of being "substantial." Comment f to § 187 of the Second Restatement on Conflict of Laws suggests factors to be considered in determining whether the state of the chosen law has a substantial relationship to the parties, including: "where one of the parties is domiciled or has his principal place of business"; the state "where performance by one of the parties is to take place"; and "the place of contracting."

Neither party is domiciled in New York, nor is it the location of Plaintiff's principal place of business or corporate headquarters.[2] *See Chrysler*, 448 Mich. at

---

[1] While courts are weary to give parties "more than [they] bargained for," *Johnson v. Ventra Grp., Inc.*, 191 F.3d 732, 739 (6th Cir. 1999) (refusing to void a specifically negotiated choice of law provision), here the record indicates that Defendant was not given an opportunity to negotiate the choice of law provision within the Agreements.

[2] Plaintiff does have an office in New York, and describes its presence there as "significant." Dkt. No. 42, p. 7 (Pg. ID No. 766). Other circuits have held that merely having an office location in a state is not a strong enough connection to apply that state's law, where one party has no apparent connection with the state. *Fin. One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 337–39 (2d Cir. 2005). In *Finance One*, the Second Circuit decided against a defendant's request to apply New York law, as chosen in a relevant agreement between the parties, for several reasons. *Id.* First, although the defendant had its principle place of business

126–27 (determining that the choice of Michigan law was valid where the plaintiff had its principal place of business in Michigan, the defendant was incorporated in Michigan, and the place of negotiation and contracting was in Michigan). *See also Bank of New York v. Janowick*, 470 F.3d 264, 271 n.3 (6th Cir. 2006) (determining that contractual choice of law provisions selecting New York law did not apply where the dispute did "not involve any parties domiciled in New York, nor any business conducted in New York.").

Furthermore, the Agreements were made in California, where the Defendant manifested his assent by electronically signing and emailing the documents provided to him. *See Visalus Inc. v. Bohn*, No. 13-10366, 2013 WL 1759420, at *3 (E.D. Mich. Apr. 24, 2013) ("Under Michigan law, 'a contract is deemed to have been made in the State where the last act necessary to make it a binding agreement took place.' "). *But cf. Indus. Indem. Ins. Co. v. United States*, 757 F.2d 982, 987–88 (9th Cir. 1985) (finding that Illinois law lacked a substantial relationship to the parties, even though it was the place of contracting).

The Agreements' did not stipulate a place of performance, but the place would be determined to be either Jersey, where Plaintiff is incorporated, or

---

in New York, the plaintiff's only connection with New York was its relationship to the defendant. *Id*. at 337–38. Second, none of the negotiations and activity related to the parties' transaction took place in New York. *Id*. at 337. Third, the defendant's argument that New York had a strong interest in "maintaining [its] role as the world's leading financial center" was not sufficient, where the latter interests were particularized to the dispute at hand. *Id*. at 339.

California, where Defendant performed his duties in consideration for the stock award. *See First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 621 (1983) ("As a general matter, the law of the state of incorporation normally determines issues relating to the *internal* affairs of a corporation."); *Liberty Mut. Ins. Co. v. Vanderbush Sheet Metal Co.*, 512 F. Supp. 1159, 1167 (E.D. Mich. 1981) ("Generally, 'state of performance' has been understood to mean the state in which the party who has allegedly breached the contract was obliged to perform."); *Structural Dynamics Research Corp. v. Eng'g Mechanics Research Corp.*, 401 F. Supp. 1102, 1115 (E.D. Mich. 1975) (stating, in a suit regarding the alleged breach of a confidentiality agreement, that "where the place of performance is not focused in any particular state, courts have held that in the absence of evidence to the contrary, the parties intended that the law of the place where the contract was made should govern questions of validity.").

Nevertheless, parties may have a reasonable basis to choose a state with which the contract has no substantial relationship.[3] *See* Rest.2d Conflict of Laws § 187 comment f (1971) (detailing that a contract involving parties from countries with "relatively undeveloped legal systems should be permitted to submit their contract to some well-known and highly elaborated commercial law."). Indeed, Plaintiff makes the argument that New York law was selected over the law of

---

[3] A bare desire to evade a state's fundamental public policies is not a reasonable basis to choose the law of an unrelated state.

Jersey, where Plaintiff is headquartered, for the reason that it is better understood. Dkt. No. 42, p. 7 (Pg. ID No. 766).

Other reasons cited by Plaintiff for applying New York law rely on the fact that Plaintiff's stock is nationally traded in New York and that the application of New York law to all stock agreements provides consistency. *Id*. Although *Bajorek*, which Plaintiff cited, supports the premise that a "corporation *headquartered in New York* has an interest in having all its stock option agreements with employees in different places construed according to the same law," the fact that the corporation was headquartered in the same state as it was traded appears to play a substantial role in the choice of law analysis. 191 F.3d at 1038 (emphasis added). *See also Lowry Computer Products, Inc. v. Head*, 984 F. Supp. 1111, 1114 (E.D. Mich. 1997) (finding that there was a reasonable basis for the plaintiff, a Michigan corporation, choosing Michigan law to ensure certainty in defending its rights in suits with employees around the country); *Ayco Co., L.P. v. Frisch*, 795 F. Supp. 2d 193, 202 (N.D.N.Y. 2011) (noting New York's interest in protecting companies located in New York, in a suit brought by a company incorporated in New York).

In summary, Plaintiff is headquartered in Jersey, United Kingdom, and maintains its principal place of business in Michigan. While Defendant lived in New York briefly while working for Plaintiff over a decade ago, since signing the Agreements in 2014 and 2015, Defendant's residence and employment has been

entirely within California. The Agreements were sent electronically to Defendant, who accepted and signed all of them in California. The breach alleged by Plaintiff has taken place entirely within California. Although Michigan and California both have significant relationships to each of the parties, New York does not. *Cf. Indus. Indem. Ins. Co.*, 757 F.2d at 987–88 ("Other states with a more significant relationship to the transaction could have been chosen to achieve uniformity of contract interpretation."). Based on the facts presented, the Court determines that New York has no substantial relationship to the parties or this specific transaction, and no reasonable basis for the choice of New York law was articulated.

### 2.  Determining Which State's Law To Apply

Since the choice of New York law is invalid, the Court must apply Michigan law to determine which state's law should apply. Section 188 of the Second Restatement on Conflict of Laws provides that a court should apply the law of the state with the most significant relationship to the transaction and parties, taking five contacts into account: (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties. *See Mill's Pride*, 300 F.3d at 705–06. "These contacts are to be evaluated according to their relative importance with respect to the particular issue." Rest.2d Conflict of Laws § 188(2) (1971).

-13-

Additionally, the section 188 contacts are to be considered in light of the principles detailed in section 6 of the Restatement:

> (a) the needs of the interstate and international systems;
> (b) the relevant policies of the forum;
> (c) the relevant policies of the other interested states and the relative interests of those states in the determination of the particular issue;
> (d) the protection of justified expectations;
> (e) the basic policies underlying the particular field of law;
> (f) certainty, predictability and uniformity of result; and
> (g) ease in the determination and application to the law to be applied.

Rest.2d Conflict of Laws §§ 6, 188(2) (1971).

In the present case, none of the section 188 contacts point to New York. However, the balance of contacts does not reach a clear result when the contacts are evaluated according to relative importance with respect to this specific dispute. The place of contracting was California, where Defendant took the last act necessary to validate the contract by emailing[4] the electronically signed copy in 2014 and accepting the digital offer in 2015. There was no place of negotiation, as Plaintiff did not provide Defendant with an opportunity to negotiate the Agreements. Defendant performed—and allegedly breached—his obligations under the Agreements in California, whereas Plaintiff was to perform its obligation

---

[4] In Michigan, email constitutes an acceptance of an offer and creates a contract where "the individual to whom an offer is extended manifests an intent to be bound by the offer, and all legal consequences flowing from the offer, through voluntarily undertaking some unequivocal act sufficient for that purpose." *Kloian v. Domino's Pizza L.L.C.*, 273 Mich. App. 449, 453–54 (2006) (quoting *Blackburne & Brown Mortgage Co. v. Ziomek*, 264 Mich. App. 615, 626–27 (2004)).

to issue stock from its headquarters in the Jersey. The Agreements' subject matter concerned a stock award that Defendant would receive in return for maintaining confidentiality and signing a non-compete agreement; thus this contact involves the property of Plaintiff, a Jersey and Michigan company. Finally, Defendant resides in California, while Plaintiff is headquartered in Jersey, and has a principal place of business in Michigan.

The contacts mentioned above also must be weighed in light of the principles mentioned in section 6 of the Restatement. Rest.2d Conflict of Laws § 6 (1971). The ease in the determining and applying the law to this dispute weighs against application of Jersey law. Nevertheless, Plaintiff's expectation that all of its stock awards would be governed predictably by a singular choice of law is not unjustified. Plaintiff is a citizen of Michigan, where it holds its principal place of business.[5] Therefore, all of Plaintiff's stock awards have a substantial relationship to Michigan, regardless of the place where each executive lives and works. Defendant chose to work for a Michigan employer and has traveled to Michigan for work eight times since June 2014, when the first agreement was signed. Dkt.

---

[5] The Supreme Court has defined "principal place of business" as "referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities." *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010). "It is . . . the corporation's 'nerve center' . . . where the corporation maintains its headquarters—provided that the headquarters is the actual center of direction, control, and coordination . . . not simply an office where the corporation holds its board meetings." *Id*. at 93.

No. 31-2, p. 5 (Pg. ID No. 561). Additionally, relevant policies in forum state of Michigan protect businesses from breaches of non-compete agreements. *See* MICH. COMP. LAWS § 445.774a. Although California has an interest in protecting its residents and workers from contracts contrary to state policy, forum precedent supports the argument that Michigan has a materially greater interest in protecting its businesses from breaches of agreements concerning employment restrictions, at least where trade secrets are concerned. *See Lowry Computer Products*, 984 F. Supp. at 1114 ("As held by the California Supreme Court, § 16600 'invalidates provisions in employment contracts prohibiting an employee from working for a competitor after completion of his employment . . . unless they are necessary to protect the employer's trade secrets.' ").

Thus, after evaluating contacts according to their relative importance and in light of the interests of the involved states, the Court will apply Michigan law to Plaintiff's contract and tort claims.

## B. Preliminary Injunction

The present motion addresses Plaintiff's request for a preliminary injunction to prevent Defendant from violating the Agreements' terms regarding post-employment restrictions and use of Plaintiff's confidential information and trade secrets.

A preliminary injunction seeks to "maintain the status quo pending a final hearing regarding the parties' rights." *All. for Mentally Ill of Michigan v. Dep't of Cmty. Health*, 231 Mich. App. 647, 655–56 (1998). Whether to grant such relief is a matter within the discretion of the district court. *See Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.,* 511 F.3d 535, 540 (6th Cir. 2007). The Court must balance four factors in determining whether to grant a request for a preliminary injunction. *Id.* at 542. Those factors are:

(1) whether the movant has a strong likelihood of success on the merits;
(2) whether the movant would suffer irreparable injury without the injunction;
(3) whether issuance of the injunction would cause substantial harm to others; and
(4) whether the public interest would be served by the issuance of the injunction.

*Id.* Applying the above factors, the Court determines that some of the requested relief is appropriate at this juncture.

### 1. Whether The Movant Has A Strong Likelihood Of Success On The Merits.

First, the Court must determine whether the movant has demonstrated a strong likelihood of success on the merits. *See Certified Restoration Dry Cleaning*, 511 F.3d at 543. Although a party need not prove its case in full at this early stage in the proceedings, the movant must show more than a mere possibility of success. *Id.*

-17-

Plaintiff's Complaint includes four counts against Defendant: (1) breach of contract; (2) common law misappropriation of trade secrets; (3) statutory misappropriation of trade secrets, pursuant to the Michigan Uniform Trade Secrets Act, MICH. COMP. LAWS § 445.1901, *et seq.* ("MUTSA"); and (4) breach of fiduciary duties. Dkt. No. 16, pp. 22–26 (Pg. ID No. 154–58). The Court will evaluate the likelihood of success on each individual claim.

### a. Breach of Contract Claim

Plaintiff's first claim alleges that Defendant violated the Agreements' terms involving confidentiality and non-competition obligations. Specifically, the Agreements prohibited Defendant from engaging in any activity that directly or indirectly competes with Plaintiff's current or proposed products and services, anywhere in the world, for the period of one year. Dkt. No. 16-2, pp. 15–16 (Pg. ID No. 178–79). The Agreements further prohibit Defendant from soliciting or interfering with Plaintiff's business for the period of two years. *Id.*

Although courts general presume the enforceability of contracts, "noncompetition agreements are disfavored as restraints on commerce and are only enforceable to the extent they are reasonable." *Coates v. Bastian Bros., Inc.*, 276 Mich. App. 498, 507 (2007). The party seeking enforcement bears the burden of demonstrating the validity of the agreement. *Id.* Michigan law provides that a non-compete agreement is enforceable to the extent it is "reasonable as to its duration,

-18-

geographical area, and the type of employment or line of business." MICH. COMP. LAWS § 445.774a(1). "To be reasonable in relation to an employer's competitive business interest, a restrictive covenant must protect against the employee's gaining some unfair advantage in competition with the employer, but not prohibit the employee from using general knowledge or skill." *St. Clair Med., P.C. v. Borgiel*, 270 Mich. App. 260, 266 (2006). An agreement that is unreasonable in any respect may be limited by a court to render the agreement reasonable in light of the circumstances in which it was made. MICH. COMP. LAWS § 445.774a(1)

Specific to Plaintiff's allegation that Defendant breached the Agreements, Plaintiff needs to establish a strong likelihood that the parties had a valid contract,[6] Defendant breached the terms of the contract, and Defendant's breach caused Plaintiff's injury. *See In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003).

Defendant claims that the Agreements' non-compete provisions were illegal under California law; however, the Court will utilize Michigan law to determine the validity and reasonableness of the Agreements' terms. As mentioned above, there are three areas typically scrutinized in the analysis of a non-compete

---

[6] The elements of a valid contract in Michigan are as follows: (1) the parties were competent to contract; (2) the subject matter of the contract was proper; (3) there was legal consideration for the contract; (4) there was mutuality of agreement; and (5) there was mutuality of obligation. *In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003).

-19-

agreement in Michigan: duration, geographic area, and type of employment or business prohibited. *See* MICH. COMP. LAWS § 445.774a(1).

First, the Court considers the duration of the Agreements' restrictions. The Agreements' duration of one to two years lies squarely within the allowable time span within Michigan. *See Kelly Servs., Inc. v. Noretto*, 495 F. Supp. 2d 645, 657 (E.D. Mich. 2007) (collecting cases where restrictions from six months to three years were permitted in Michigan).

Next, the Court examines the geographic limitations of the restrictive covenant. The Agreements' non-compete provision has no geographical limitation. While an unlimited geographical scope may be reasonable in some circumstances, "geographic limitations in non-competition agreements must be tailored so that the scope of the agreement is no greater than is reasonably necessary to protect the employer's legitimate business interests." *Superior Consulting Co. v. Walling*, 851 F. Supp. 839, 847 (E.D. Mich. 1994). Although the specific facility Defendant directed—Delphi Labs @ Silicon Valley—was entirely within California's borders, autonomous vehicle technology is a small and specialized field that is international in scope. Thus, the global restriction in the present case was not necessarily unreasonable under Michigan law.

Finally, the Court assesses the scope of the type of employment or line of business prohibited. Under the Agreements, Defendant may not engage in any

-20-

activity that directly or indirectly competes with a broad array of goods and services currently offered or proposed to be offered in the future by Plaintiff. It does not appear that there was any attempt to tailor the restrictions to only encompass Plaintiff's "reasonable competitive business interests," with respect to the work Defendant performed for Plaintiff. *See Whirlpool Corp. v. Burns*, 457 F. Supp. 2d 806, 813 (W.D. Mich. 2006). Such overbreadth is impermissible under Michigan law. *See Mapal, Inc. v. Atarsia*, No. 15-CV-12159, 2015 WL 7717185, at *6 (E.D. Mich. Nov. 30, 2015) (finding a non-compete agreement that precluded a former employee from joining a "direct or indirect" competitor, anywhere in the world, in any capacity, to be overbroad); *New World Sys. Corp. v. Jones*, No. 06-11603, 2009 WL 996954, at *12 (E.D. Mich. Apr. 14, 2009) (determining that a limitation that prohibited a former employee from working for a direct or indirect competitor in any capacity was too broad to be enforceable).

However, the Court may modify the terms of an unreasonable non-compete agreement to render it reasonable. Mich. Comp. Laws § 445.774a. The briefs and arguments at the motion hearing demonstrated that Defendant's duties at the time the Agreements were signed involved growing his office team and developing technology at Delphi Labs @ Silicon Valley, as well as facilitating customer relationships and developing international autonomous vehicle business strategy. Accordingly, the Court will limit the non-compete to only prohibit Defendant from

working in the area of autonomous vehicle technology, including marketing and development of that technology.

After modifying the Agreements to limit the type of employment restriction, the Court finds that the non-compete provisions are reasonable under Michigan law. Accordingly, for the reasons set forth above, Plaintiff has shown a "strong likelihood" of prevailing on the merits of its breach of contract claim.

### b.  Common Law Misappropriation of Trade Secrets Claim

Second, Plaintiff alleges that Defendant misappropriated, used, and will continue to use its trade secrets, in breach of Defendant's agreement and duties to Plaintiff. Dkt. No. 16, p. 23 (Pg. ID No. 155). This claim appears to be based off of the digital files on external hard drives, in his Dropbox account, and emails that Defendant retained after terminating his employment with Plaintiff. *See id*. at 17–22 (Pg. ID No. 149–54). Defendant submitted affidavits that state that the drives and files were quarantined with a computer forensic company in such a manner as to make them inaccessible to Defendant and any other third party without instruction from Defendant's counsel. Dkt. No. 31-2–31-4. At the hearing, Plaintiff's counsel stated that the drives have been transferred into Plaintiff's possession.

Plaintiff has brought both common law and statutory misappropriation of trade secrets claims. Dkt. No. 16, pp. 23–25 (Pg. ID No. 155–57). The two claims

appear to rely on the same alleged acts of misappropriation. *See id*. "The MUTSA displaces claims that are 'based solely upon the misappropriation of a trade secret.' " *Wysong Corp. v. M.I. Indus.*, 412 F. Supp. 2d 612, 623 (E.D. Mich. 2005) (quoting *Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.*, 270 F. Supp. 2d 943, 951 (W.D. Mich. 2003)). Since Plaintiff's common law misappropriation of trade secrets claim is based solely upon misappropriation of trade secrets, this claim would be preempted by the MUTSA.

Thus, the Court finds that Plaintiff has no chance of succeeding on the merits of its common law misappropriation of trade secrets claim.

### c. Michigan Uniform Trade Secrets Protection Act Claim

In its third claim, Plaintiff alleges that Defendant violated the MUTSA. Dkt. No. 16, pp. 24–25 (Pg. ID No. 156–57). As mentioned above, the alleged misappropriation appears to have arisen out of Defendant's retention of external hard drives,[7] work files in Defendant's Dropbox account, and work-related emails.

The MUTSA specifically authorizes the use of injunctive relief. MICH. COMP. LAWS § 445.1903. "Misappropriation" is defined by the MUTSA as meaning either of the following:

---

[7] Although these external hard drives were purchased privately by Defendant—i.e., they were not Plaintiff's property—the drives contained a mixture of personal files and files from Defendant's employment with Plaintiff.

-23-

(*i*) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.

(*ii*) Disclosure or use of a trade secret of another without express or implied consent by a person who did 1 or more of the following:

> (A) Used improper means to acquire knowledge of the trade secret.

> (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person to maintain its secrecy or limit its use.

> (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

MICH. COMP. LAWS § 445.1902(b). A "trade secret" is defined as:

> "[I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that is both of the following:

> > (*i*) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

> > (*ii*) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

MICH. COMP. LAWS § 445.1902(d).

Plaintiff relies on *Actuator Specialties, Inc. v. Chinavare*, No. 297915, 2011

WL 6004068 (Mich. Ct. App. Dec. 1, 2011), in support of granting an injunction.

-24-

In *Actuator Specialties*, the Court of Appeals affirmed an injunction issued by the district court after finding that the defendant's conduct raised "warning flags." *Id*. at \*4. Specifically, the defendant had downloaded confidential files—that he had no reason to access—three days before resigning, loaded the confidential files onto his new employer's work computer after a temporary restraining order addressing the files was issued, and altered his former employer's files by replacing the letterhead with his new employer's name. *Id*. Additionally, the defendant's new employer hired away three of his former coworkers and plagiarized a PowerPoint presentation created by defendant's former employer. *Id*. at \*5.

The concrete allegations and specificity provided in *Actuator Specialties* are missing in the present case. Plaintiff has not pled any facts that indicate Defendant actually provided Samsung with its confidential files,[8] relying instead on a theory that since he has files, they will be inevitably disclosed. "The 'inevitable disclosure' doctrine, however, has not been adopted by Michigan courts." *Kelly Servs., Inc. v. Marzullo*, 591 F. Supp. 2d 924, 942 (E.D. Mich. 2008). "Even assuming that the concept of 'threatened misappropriation' of trade secrets encompasses a concept of inevitable disclosure, that concept must not compromise

---

[8] While originally Defendant did not give Plaintiff full access to the intermingled work and personal files on his personal hard drives and digital accounts, there are no allegations that he gave the items over to his new employer either.

the right of employees to change jobs." *CMI Int'l, Inc. v. Intermet Int'l Corp.*, 251 Mich. App. 125, 133–34 (2002).

Thus, since there have been no allegations of actual misappropriation, the Court will consider whether there is a substantial likelihood of Plaintiff succeeding on the claim of threatened misappropriation. "To establish threatened misappropriation, a party must *specifically identify the trade secret* likely to be misappropriated and must convince the court of the former employee's 'duplicity' by proffering evidence indicating a significant lack of candor or willingness to misuse trade secrets." *Gene Codes Corp. v. Thomson*, No. 09-14687, 2011 WL 611957, at *5 (E.D. Mich. Feb. 11, 2011) (emphasis added). *See also CMI Int'l*, 251 Mich. App. at 134 ("the party must establish more than the existence of generalized trade secrets"). "Where 'evidence and arguments are presented in support of both parties' contentions' in a trade secrets case, and plaintiff fails to identify an actual lost customer, plaintiff cannot establish 'a substantial likelihood of success on the merits' and injunctive relief is not warranted." *PrimePay, LLC v. Barnes*, No. 14-11838, 2015 WL 2405702, at *23 (E.D. Mich. May 20, 2015) (quoting *Kelly Servs., Inc. v. Pinstripe, Inc.*, No. 06–10801, 2006 WL 2796018, at * 5 (E.D. Mich. Sept. 27, 2006)).

Here, the pleadings lack both the allegation of the specific trade secret absconded, as well as adequate evidence to convince the Court of Defendant's

duplicity. The facts indicate that Defendant was forthcoming to Plaintiff about his intention to work for Samsung, gave Plaintiff the opportunity to provide a counter-offer, and ultimately decided to terminate his employment relationship with Plaintiff based on Samsung's superior offer. *See PrimePay*, 2015 WL 2405702 at *32 (noting that being forthright about a future job during termination of the employment relationship weighed against duplicity). The quagmire of file retention appears to have been the result Plaintiff's decision to have Defendant transition out of the office immediately, rather than an act of duplicity by Defendant. *See id.* at *31 (determining retention of a laptop containing an employer's information did not establish a strong likelihood of duplicity). The quarantine of hard drives and the Dropbox account prevented files from being transmitted to Samsung, and Plaintiff's counsel stated at the hearing that they are now in possession of the data that was quarantined.

The Court finds that Plaintiff has not established a strong likelihood of succeeding on its MUTSA claim.

### d.  Breach of Fiduciary Duties Claim

Plaintiff's fourth and final claim alleges that Defendant breached his fiduciary duties to Plaintiff by illegally taking and using Plaintiff's proprietary and confidential information.[9] Dkt. No. 16, p. 26 (Pg. ID No. 158).

"The elements of a fiduciary duty claim are (1) the existence of a fiduciary duty, (2) a breach of that duty, (3) proximately causing damages." *Stryker Corp. v. Ridgeway*, No. 1:13-CV-1066, 2015 WL 8759220, at *3 (W.D. Mich. Dec. 14, 2015). "Under Michigan law, 'a fiduciary relationship arises from the reposing of faith, confidence, and trust and the reliance of one on the judgment and advice of another.' " *Petroleum Enhancer, LLC v. Woodward*, 690 F.3d 757, 765–66 (6th Cir. 2012) (quoting *Teadt v. Lutheran Church Mo. Synod*, 237 Mich. App. 567, 580–81 (1999)). A fiduciary has a duty to act for the benefit of the principal regarding matters within the scope of the relationship. *Id*. at 766. Courts determine whether a fiduciary duty exists. *Id*.

"The general rule is that the employer-employee relationship does not give rise to a fiduciary relationship unless the employee is a high-level employee, or if there is a specific agency relationship." *Stryker*, 2015 WL 8759220 at *3. *See also*

---

[9] Section 8 of the MUTSA displaces claims that are "based solely upon the misappropriation of a trade secret." MICH. COMP. LAWS § 445.1908(1); *Wysong Corp. v. M.I. Indus.*, 412 F. Supp. 2d 612, 623 (E.D. Mich. 2005). Accordingly, in order for Plaintiff to state a valid claim for breach of fiduciary duty, the claim must differ from the alleged misappropriation of a trade secret.

*Dana Ltd. v. Am. Axle & Mfg. Holdgins, Inc.*, No. 1:10-CV-450, 2012 WL 2524008, at *11 (W.D. Mich. June 29, 2012) (interpreting "high-level employees" to include corporate officers and members of corporate boards of directors and determining that all employees do not owe their employer a fiduciary duty). Generally, "the act of preparation to compete during current employment does not constitute a breach of fiduciary duty." *Creelgroup v. Brieden*, No. 09-12493, 2010 WL 3023815, at *3 (E.D. Mich. July 29, 2010).

Assuming, without deciding, that Defendant had a fiduciary relationship with Plaintiff, there are still two more elements of the claim that must be established: breach of duty and proximately caused damages. Plaintiff's claim alleges that Defendant "disclosed and inevitably will continue to disclose [Plaintiff's] proprietary/confidential information." Dkt. No. 16, p. 26 (Pg. ID No. 158). However, Plaintiff does not hint as to what confidential information Defendant allegedly disclosed and how it differs from the information allegedly misappropriated. Plaintiff also fails to provide any details regarding the disclosure besides the bare assertion that it occurred. There are not sufficient facts alleged to establish a strong likelihood that Defendant actually disclosed Plaintiff's confidential information to anyone, including his new employer.

Furthermore, Plaintiff has not made any allegations as to the damages the company suffered from Defendant's alleged breach. Plaintiff does not point to a

-29-

single customer, revenue stream, or opportunity lost, resting merely on a claim that Defendant's "conduct has caused and inevitably will continue to cause Delphi substantial damage." Since the Court is not privy to what exactly that "substantial damage" consists of or how a breach by Defendant caused it, Plaintiff has not established a strong likelihood of succeeding on the merits of its breach of fiduciary duty claim.

## 2. Whether The Movant Would Suffer Irreparable Injury Without A Preliminary Injunction.

Second, the Court considers whether the movant will suffer irreparable harm in the absence of preliminary relief. *See Certified Restoration Dry Cleaning*, 511 F.3d at 550. Such harm is not "irreparable" if it can be fully compensable by the payment of monetary damages. *Id*. "In addition, the harm alleged must be both certain and immediate, rather than speculative or theoretical." *Michigan Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991). *See also Kelly Servs., Inc. v. Marzullo*, 591 F. Supp. 2d 924, 942 (E.D. Mich. 2008) ("It is well established that an injunction will not lie upon the mere apprehension of future injury or where the threatened injury is speculative or conjectural."). "A relative deterioration of competitive position does not in itself suffice to establish irreparable injury." *Thermatool Corp. v. Borzym*, 227 Mich. App. 366, 377 (1998).

Plaintiff asserts that it will suffer irreparable injury without injunctive relief due to autonomous vehicle technology being at a "critical development stage." Dkt. No. 18, p. 33 (Pg. ID No. 280). According to Plaintiff, the personal knowledge and files possessed by Defendant could cost Plaintiff its competitive advantage, which it spent hundreds of millions of dollars to obtain. *Id*. The suggested damages are allegedly incalculable, should Defendant disclose Plaintiff's information to his new employer. *Id*.

Considering the harm alleged by Plaintiff, the Court determines that this factor weighs in favor of issuing an injunction against Defendant's work in autonomous vehicle technology for the year specified in the Agreements.

### 3. Whether Issuance Of The Injunction Would Cause Substantial Harm To Others

In the third factor, the Court must consider whether issuing the injunction would result in substantial harm to others.[10] *See Certified Restoration Dry Cleaning*, 511 F.3d at 550–51.

In this case, Plaintiff seeks to enjoin Defendant from employment with Samsung or otherwise engaging in business that "directly or indirectly" competes with products or services Plaintiff provides. Such an injunction, without

---

[10] This third factor refers to "the balance of equities between the movant and other parties, not just third parties to the litigation." *Rhinehart v. Scutt*, 509 F. App'x 510, 515 (6th Cir. 2013).

modification by the Court, would result in Defendant's loss of his sole income and preclude him from working within his field of expertise. Plaintiff does not dispute that issuance of an injunction would cause Defendant substantial hardship, as Defendant only received around $3,610.00 in stock awards in return for being restricted in his ability to work for one year.[11] Dkt. No. 18, p. 35 (Pg. ID No. 282). Nevertheless, Plaintiff argues that this factor weighs in its favor because Defendant voluntarily entered into the Agreements. *Id*.

The Court has already determined that it is necessary to modify the Agreements' employment limitation to prohibit Defendant only from working in the field of autonomous vehicle technology for the period of one year from the termination of his employment with Plaintiff. This modification of the employment restrictions allows Defendant to work in other areas in which he has expertise, thus reducing the hardship that he would suffer from an injunction.

Accordingly, since Defendant knowingly and voluntarily entered into the Agreements and decided to terminate his employment with Plaintiff to work for Samsung, the Court finds that this factor weighs in favor of issuing an injunction.

---

[11] Defendant received $3,610.00 in stock awards prior to terminating his employment. Dkt. No. 18-14, p. 1 (Pg. ID No. 449). He made efforts to return the funds to Plaintiff. Dkt. No. 18, p. 36 n.4 (Pg. ID No. 282). Plaintiff refused to accept the tender. *Id.*

**4. Whether The Public Interest Would Be Served By The Issuance Of The Injunction.**

The final factor for the Court to consider is "whether the public interest would be served by the issuance of the injunction." *Certified Restoration Dry Cleaning*, 511 F.3d at 551. There is a general public interest in the enforcement of voluntarily assumed contract obligations. *Id*. It is also important to strike the "proper balance between the public policy of Michigan . . . of protecting and encouraging the right of the individual to pursue his livelihood in the vocation he chooses, including the right to migrate from one job to another, and the rights of an employer to its accumulated body of trade secrets obtained by the expenditure of great amounts of time and money." *Hayes-Albion v. Kuberski*, 421 Mich. 170, 188 (1984) (quoting *Allis-Chalmers Mfg. Co. v. Continental Aviation & Engineering Corp.*, 255 F. Supp. 645, 654 (E.D. Mich. 1966)).

In *Certified Restoration Dry Cleaning*, enforcement of the clause in question did not run afoul of antitrust policy because it was reasonable in purpose, scope, and duration. 511 F.3d at 551. The public interest is not served by enforcing overbroad employment prohibitions that expand far beyond a plaintiff's reasonable competitive business interests. *See Hayes-Albion*, 421 Mich. at 189 ("Injunctions should be narrowly tailored as to not prevent individuals from earning a living in the field in which they have expertise."). After being modified by the Court, the Agreements no longer extend beyond Plaintiff's business interests in such a way

that would render them against public policy. Additionally, the public interest would be served by protecting Plaintiff's trade secrets.

After balancing the competing interests, the Court finds that this factor weighs in favor of granting a preliminary injunction.

## IV. CONCLUSION

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Courts must balance each party's competing claims and consider the impact of granting or withholding the movant's requested relief. *Id*.

In the present case, the four factors evaluated weigh in favor of granting an injunction based on the modified Agreements. Accordingly, for the reasons discussed herein, the Court **GRANTS** Plaintiff's Motion for Preliminary Injunction [18].

IT IS ORDERED that Defendant shall not engage in employment in the field of autonomous vehicle technology for twelve months after the termination of his employment with Plaintiff.

IT IS FURTHER ORDERED that Defendant shall neither use nor disclose Plaintiff's confidential business information, trade secrets, and/or proprietary information;

IT IS FURTHER ORDERED that the parties shall neither destroy, alter, modify nor conceal any relevant data, including data stored on computer media;

Dated:        March 1, 2016

/s/Gershwin A Drain
HON. GERSHWIN A. DRAIN
United States District Court Judge